The Judges delivered their opinions.
JUDGE TUCKER
pronounced the following, in the case of Dilliard v. Tomlinson. This is the very same case which was decided in this Court, October term, 1801, and is reported in 3 Call, 105, under the title of Tomlinson v. Dilliard. In October, 1803, a petition of appeal was allowed by this Court on errors suggested in carrying the decree of this Court into execution. In the statement presented by the appellant’s counsel it is suggested that the appeal was prayed for and allowed by the Court; not only on account of the alleged errors after the decree of this Court was rendered, but for the purpose of inducing this Court to reconsider the original decree, in the appeal, upon which they have already decided, upon full argument, and mature consideration, as appears by the report above referred to. As I had not the honour of being a member of this Court when the petition of appeal was allowed, I must rely on the appellant’s counsel for the correctness of this statement.
Whether this Court hath power, upon a second appeal made in the same cause, to reconsider and reverse its former decision upon a point solemnly debated at the bar, and with no less solemnity considered and decided by a full Court, is a point of great magnitude and importance to the Commonwealth. If it hath such a power, (which I strongly incline to doubt,) it ought not to be exercised but upon, some very great and important occasion of general concern and of great magnitude to the parties. The number of appeals taken upon the same point since this petition of appeal was allowed, is evidence of the inconvenience which might ensue from the indulgence of such a practice; and the great length of time which has been consumed in the discussion during the present term, (nearly five days,) warns us to beware of the consequences which might ensue from a departure from that principle which regards the decision of this Court as final and 196 conclusive between the parties *in the same cause, upon any point which shall have received a full discussion at the bar, and the mature consideration of the Court, (a) It is unnecessary to enlarge further upon this previous question in the present case, because, after an attentive perusal and consideration of the arguments both of the bar and of the bench, in the case of Tomlinson v. Dilliard, I am constrained to say, “that the words of the law are too plain and positive to admit of doubt or construction;” as was said by the Court in their decree in that case. I shall therefore proceed to consider the errors alleged against the Chancellor’s decree, after the decree made in this Court.
The first exception to the Commissioner’s report appears to me to be without foundation. The second, that interest is charged upon the hire of the slaves, though not very important in amount, being only 151. Is. Id. is so in principle. The defendant is charged with interest from the very day the negroes’ hire became due; whether it were received by him or not. This cannot be right: for it presupposes a fact which seldom or never happens in this country; that a debt is always punctually paid the very day it falls due. But, admit it were received on the day it became due; is an administrator chargeable with money received even upon a bond or mortgage, if there be no person authorized to receive it from him? Suppose a creditor out of. the state, without any known attorney or agent within it; is the administrator chargeable with interest on the money in his hands which he has no means of paying away? Suppose, also, that the distributees are infants who have no guardian assigned them; is the administrator to pay interest until they have a guardian, or come of age? Suppose, as in the present case, he knows not to whom he is by law bound to make payment; shall he be charged with interest, until the question shall be decided by this tribunal? Lord Ch. Loughborough, in the case of Creuze v. Hunter, says, 1 ‘I always understood the constant course of the Court was, that debts carrying interest had interest corn-197 puted by the ^report to the time of actual payment; but simple contract *83 debts, not carrying interest had no interest, computed by the Master.” He then asks, “Does any one remember an instance of the Master’s computing interest on such dents as, on his report, do not carry interest?” (a) What is the hire of a slave but a simple contract debt arising from the labour of the slave? If so, is it not within the rule thus emphatically recognised, as the constant course of the Court of Chancery in England, from which we have borrowed almost all our ideas and rules of equity? I am, therefore, of opinion, that there is error in so much of the Chancellor’s decree as allows this charge of 151. Is. Id. for interest on the negroes’ hire; and a still further error in allowing the interest on 1951. 4s. 5d. the amount of the slave hire received by the administrator beyond the date of the decree; as was decided in the case of Brewer v. Hastie, (b) and Deans v. Scriba. (c)
The next question is, in what manner this 1951. 4s. 5d. arising in part from the hire of negroes, and, in part, perhaps, from the rents of lands, is to be distributed. In the case of Blount and Wife v. Gee, decided in this Court, November, 1, 1805, (d) it was determined that Mrs. Gee, the mother of Sarah Jones, was entitled to inherit lands from that daughter who died an infant, which she had derived from her brother John Norfleet, to whom the same were devised by his father, who was also the father of Sarah Jones. In that case, however, John Norfleet had attained his age of twenty-one years: but I was of opinion, and understood the rest of the Judges who sat in the cause, to concur with me in that opinion, that the mother might have inherited these lands although John Norfleet had not attained his age of twenty-one years; for that the descent from the father to the daughter was not immediate, but broken: and therefore not within the exceptions contained in the fifth and sixth sections of the law of descents. I incline to adopt the same construction with respect to rents, issues and profits, either of 198 land or slaves, and even of ^personal estate generally, where the same can be clearly ascertained and identified as such. Otherwise, they must go with the principal subject, whatever it be. Upon these grounds, I think this money should be distributed according to the fourth section of the law of descents, and not according to the fifth, as the property immediately derived from the father must, according to the act of 1792. But as this point seems already decided in this case when it was formerly before this Court; and, as there may be a difference of opinion upon it; I shall, on the present occasion, press it no further, but submit to the opinion of a majority of the Court.
Upon the whole, I conceive che Chancellor’s decree ought to be affirmed, except as to the charge of interest on the hire of the negroes as before mentioned.
JUDGE ROANE
delivered the following opinion as applicable to the two cases of Dilliard v. Tomlinson, and Curtis v. Muse.
The general question occurring in both these cases is, whether the exceptions contained in the 5th and 6th clauses of the act of descents, in relation to infant intestates, extend to personal estate as well as real. In the case of Dilliard v. Tomlinson, a further question conditionally presents itself; namely, whether, in the event that the act does not, in the opinion of the Court, extend to personal estate, the Court has power to correct the decree formerly rendered in that case, as well as to render decrees, in other cases, pursuant to such construction of the act. This question becomes unnecessary to be decided, (as I understand,) in consequence of the opinion of the majority of the Court upon the principal question; and therefore I shall not enter upon it: the rather, because the question may rarely, if ever, be expected to occur in future.
In giving my opinion upon the general question aforesaid, I shall consider it as if it were an entirely new question; as if it had never before been acted upon or 199 discussed by **this Court. In doing so, I am warranted by the decision of this Court at a former term; by which it was resolved, that that question should be reconsidered, and an argument upon it was directed by the Court, and has been accordingly had, at great length. In coming to this decision in favour of a reconsideration, the Court was justified by innumerable precedents in this Court; in which the Court has admitted its own fallibility, and corrected its former errors. I will mention, in particular, the cases of Bedinger v. The Commonwealth, (e) in which this Court disclaimed a jurisdiction which it had exercised in many former instances, two of which had also gotten into print,* (a circumstance which, with upright Judges, certainly can make no difference,) and in which the Judges had also delivered seriatim opinions. Great as my respect is for this Court, I do not believe that it cannot err: nor can I believe that its decisions, if recent and erroneous, ought not to be corrected. I have the authority of Judge Pendleton, in the case of Jolliffe v. Hite, (f) for saying that they ought. Considering that the former judgment of this Court, in favour of a new argument of the question, is as obligatory upon us as the prior decision itself, which is the object of reconsideration ; and that it has always been understood by the bar, and the parties concerned, that that question was to be reconsidered by the Court; I cannot but express my surprise, that the Judge who has gone before me, seems to have shrunk from the discussion thereof, and reposed himself upon the sanctity of the former decision. I will go farther, and say, that such reconsideration is not only proper, on general principles, in relation to the decisions of all fallible tribunals, but is peculiarly so, in relation to the particular decision now before us. That decision was a single and a recent decision: the appeal which seems to have been tendered to the Legislature *84 upon it, by Judge Pendleton, (3 200 *Call, 119,) bad been immediately acted upon by that body, and the decision of the Court was reversed, (if I may so express myself,) by a declaratory act of the Legislature: and a rehearing of the question had shortly thereafter been granted by this Court. Under these circumstances, (to say nothing of the probable state of the opinion of the bar, and the public,) the decision had not been considered by our citizens as final and irrevocable, nor had ripened into a rule of property. New or none of the consequences, therefore, resulting from overturning the settled rules of propert3r, can be expected to arise, in any event, in this case.
In giving m’y opinion at present, I beg leave to have reference to, and to adopt, as part of this opinion, the one I formerly gave in this case. (3 Call, 109.) That opinion contains an imperfect, irregular, and rapid view of my ideas of the question, at that time: I shall now subjoin a few further observations upon it; but cannot omit declaring, that the ideas I submitted on that occasion, have, on long and mature deliberation and reflection, been rivetted upon my judgment, which, consequently, remains entirely unchanged.
I begin by saying, that the position that a preceding law or statute is to be considered as unchanged by a new. statute, until such change be clearly shewn to be operated thereby, emphatically exists in relation to a Legislature of revision. The Legislature of 1792 was a Legislature of revision, in relation to the general laws, although its powers to alter them is at the same time readily admitted. The committee appointed to report upon the laws, by the act of 1790, c. 20, were confined, by the terms thereof, to reducing multifarious acts into single acts; or, in other words, to the province of simplifying the laws, and not suggesting changes in them. Such was also the decision of the Legislature of 1791, (a) in its resolution in answer to a letter, upon this subject, addressed to them by the revisors. When to these considerations we add, that the Legislature both before and after the enacting the act of 1792, viz. 201 *when they enacted the act of 1790, c. 13, and that of January 22, 1802, (b) were steady in confining the exceptions in question to real estate only, it will require very strong features indeed, in the intermediate act of 1792. to extend them to personal estate also. I will here remark that Judge Pendleton, in delivering his opinion formerly in this case, (3 Call, 119,) laid great stress upon the coincidence of sentiment in the Legislature, it having, both in 1785 and 1792, (as he supposed,) declared, that land and personals should go the same way. While I must be permitted to say, that in relation to the construction of the act of 1792, that was taking for granted the very thing to be proved, I must beg leave to borrow and apply this strong argument of that great Judge, in relation to the acts of 1790 and 1802, both of which are clear beyond the possibility of a doubt, against the extension of the principle to personals; and the act of 1802 is a declaratory act in the very teeth of the former decision of this Court.
I take, it to be an undoubted rule in the construction of statutes, that general words, in a clause thereof may be restrained by particular words in another clause, subsequent thereto, (c) Applying this rule to the case before us, if, instead of the general reference in the act of distributions, for persons and proportions, to the act of descents, an insertion had been made in. the first clause of the act of descents, extending it to personal as well as real estate, and. to read thus: “That henceforth when any person having title to any real estate of inheritance (or personal estate) shall die,. &c.; and if these words, “or personal estate” had been (as they are) omitted in the 5th and 6th sections, such omission, singly taken, would operate a restraint upon the general words, and narrow the operation of the said sections to real estate only: and a fortiori, when the terms “derived by purchase or descent,” and the provisions relative to ‘ ‘curtesy and dower, ’ ’ (expressions and provisions which properly appertain to real estate, and not to personal,) are found therein, and still more so as 202 the 6th ^section (as will be shewn hereafter) would be, as to personal estate, a mere nullity, on account of the incompetency of an infant to derive personal property from his mother, it being intercepted by the superior claim of her husband.
So, on the other hand, if, instead of such reference, or such insertion, a particular law of distribution of personal estate had been enacted, precisely similar to that of descents, merely substituting the terms “personal property” in lieu of “real estate of inheritance,” and the 5th and 6th sections were still found therein precisely as they now exist; it might'be reasonable to conclude, from the foregoing considerations, that they slipped into the act by mistake, related to a subject different from that of the act, belonged properly to another law, and did not apply to the case of personal estate at all. That, however, is a broader position than is necessary to be taken in this case; in which, considering the insertion to have been made as aforesaid, on the principle “referendi singula singulis,” and of reading the act distributively, in relation to the different subjects thereof, the 5th and 6th sections would naturally fall within the class of the real, and be rejected in regard to the personal estate.
The general reference in the distribution act to the descent act, for persons and proportions, certainly cannot operate any great effect in applying the exceptions to personal estate, than if the canons of descent had been particularly repeated with respect to personal property, either in a joint or several act as aforesaid; in either of which cases (it has been endeavoured to be shewn) the 5th and 6th sections would be taken in a sense restricted to real estate. This mode of a general reference was adopted in the act of distributions for brevity only; and a specific insertion as to personal estate was only not made in the act of descents, because that act properly related to real and *85 not personal estate, and the reference was •properly made in the distribution act, because that act on the other hand properly related to personal estate. These were the only grounds and motives .203 *of the present arrangement, and therefore no greater effect will be produced than if a more particular and detailed adoption of the canons of descent had been resorted to, in relation to personal property.
I presume it is not necessary to quote authorities to shew, that a statute compounded of or relating to several subjects, may be read distributively in relation to each : nay, we are even told that the same words in a statute will bear different interpretations ; and that these words may be considered as remedial, or penal, for example, (as the case may be,) according to the nature of the suit or prosecution founded thereon, (a) So, again, taking the construction of a statute by analogy to that of a will, which, when we are in quest of intention, must stand on a common foundation with it, (with this ■additional circumstance concerning the former, that the Legislature are supposed to know the meaning of the technical words they use, (whereas testators are considered in the law as inopes consilii,) and are, therefore, rather than a testator, to be bound by them,) we are told in the case of Forth v. Chapman(b) recognised in this Court in the case of Hill v. Burrow, (c) that if a will devises real and personal estate to A. ; and, if he die leaving no issue of his body, then to B. ; that the devise shall be expounded to mean an indefinite failure of issue as to the real estate, and be restricted to issue living at the death as to the personal; shall be taken in a legal sense in relation to the former, and a vulgar sense in relation to the latter; and that the same words shall be taken in different senses as to the different estates, and the will be read as if it had been repeated by two several clauses. If this principle be extended to the case before us, and the compounded act in question be twice read, in relation to each subject, the 5th and 6th clauses will be considered as nullities when the act is read merely with respect to personal estate.
If the act in question be not read distributively as to each subject, (the real and personal estate,) the term “infant” would be taken in one sense only, and in-204 fancy would be ^'construed to continue up to 21 as to personal as well as real estate, on the ground that personal estate, which is the accessory, should follow real, which is the principal: the consequence of this would be, that, in relation to all the life of an infant between 18 and 21, the ground of the provision of the law in this instance would wholly fail, that provision being bottomed only upon the incompetency of an infant to dispose of his estate: but that incompetency does not exist as to personal estate, after the age of 18 years. It follows irresistibly, therefore, under pain of this and similar consequences and inconveniences, that the act is to be read distributively in reference to the several subjects thereof; and that, in this particular instance, infancy is to be understood, as to real estate, to continue up to the age of 21 years, and to expire as to personal at 18.
Another rule is, that a construction which tends to absurdities is not to be admitted. (d) The extension to personal property, of the exception in question, leads the Legislature into the absurdity of supposing (contrary to another principle that the Legislature is not to be supposed ignorant of the proper meaning of technical terms or phrases, or of the general provisions of the common and statute law) that personal property is to be acquired by “purchase,” or “descent;” that a husband succeeds to personal estate as tenant by the “curtesy,” and a wife as tenant “in dower,” and that an infant can derive personal estate “from his mother,” in derogation of the superior right of her husband thereto, as established both by the general provisions of the common law, and the recognition of that principle in the act of distribution, (e) We are not at liberty to garble the 5th and 6th sections, by throwing out the 6th as being wholly insignificant as applied to personal property, and by rejecting the provisions relating to “curtesy” and “dower,” contained in both, as being only applicable to lands: we must take the said sections altogether; and, when so taken, they completely and effectually exclude the idea of an extension of the principle to personal property. We have as much 205 *power to reject, on this ground, the whole of those two sections, as to reject the 6th section only, together with so much of the 5th and 6th sections as speaks in relation to “curtesy” and “dower:” we can as well reject the proviso itself, as reject the proviso of that proviso. We must not convict the Legislature of the absurdities just mentioned: we must rather say that the exceptions in question were intended to apply to “real estates of inheritance” only, as the latter of the proviso imports, and to which it is properly adapted in every point of view. We must permit the particular words in the clauses in question, having that effect ex vi terminorum, to restrain the general words of reference, which would otherwise lead to such absurdities.
Again, a statute is to be so construed, that no clause, sentence or word shall be void, superfluous, or insignificant, (f) In the case before us, the whole 6th section will be void, superfluous and insignificant, if applied to personal estate, unless we repeal the provisions of the common law, which prevent a child’s deriving _ personal property from his mother, by giving it to her husband on the marriage: but, on the contrary, the right of the husband thereto, is recognised and admitted, as aforesaid, in the same clause of the act of distributions, in which the general reference in question is made. It is of no avail to say, that a child may, in some cases, derive personal estate from his mother also as where she has, after the death of the husband, acquired such, *86 and has not again married: that, although a possible, may be considered as a rare case; and statutes are to be expounded in relation to cases “quse frequentius accidunt.” (a)
It is further held that no statute is to be so construed as to be inconvenient; and that consequences may be resorted to where the meaning of a statute is doubtful; which it may be, although the words of any particular clause (separately taken) are clear.(b) The consequences which should influence us in this case, are not only the difficulties and absurdities before stated, but 206 others which grow out of *the nature of the subject, (personal property,) to be hereafter more particularly noticed. One of these consequences, more particularly, is, that the rejection of the 6th section, as aforesaid, would not only contravene justice, and the general policy of the act, but unequally contravene (owing to the paramount laws on that subject) the clear intention of the Legislature, in the exceptions in question, which was, that property coming from the mother should go to her relations, as well as the converse: but the construction I am now combating would operate differently, and give all personal property whatsoever, however derived to the infant, to the relations on the part of the father 1
In the case of Brown v. Turberville such consequences were adjudged sufficient to control the express letter of the statute; and words were supplied, or interpolated therein, rather than overthrow and derange the general scope and policy of the act. The construction was made in that case, as I think it ought to be in this, under the influence of that rule of construction which admits a statute to be construed by equity, contrary to the letter, (which equity here stands'for the intention of the legislator), and considers that a thing (whatever the letter of the statute may be) is not within the statute, if it be not within the meaning thereof.
Another rule of construction, of most overruling influence in the present case, is, that all statutes in pari materia are to be taken together as one system, and, in a case of doubt, to be construed consistently.(c) Thus, in the MS. case of Rex v. Loxdale, referred to in the above cited passage of Bacon, it was held that, “as the statute of 39 Eliz. was undoubtedly under the consideration of the Legislature, when that of 43 Eliz. was made, it ought, although long since expired, to be taken into consideration in construing the latter statute, for that it is a rule, that all statutes which relate to the same subject, notwithstanding some of them are expired, or not referred to, must be taken as one system, and construed consistently.” Again, the English statute of 22 and 23 Car. II. 207 having enacted that every *person shall be excluded from killing game, “not having an estate of inheritance of the clear yearly value of 1001. or for life, or having a lease or leases for 99 years, of the clear yearly value of 1501.” and a doubt having arisen whether the words “or for life” should be referred to the 1001. or the 1501., the Court of K. B. having looked into the former qualification acts, and found that the qualification was an estate of inheritance of 101. per annum, and an estate for life of 301. a year, they presumed that it was still the intention of the Legislature to make the ye^rl}’ value of an estate for life greater than that of one in fee, although the same proportions were not preserved in the act in question; and decided accordingly, (d) When to these authorities we add the foregoing considerations relative to the character of the Legislature of 1792, as. a Legislature of revisal quoad the public laws of the Commonwealth, and which as such undoubtedly had all the laws on the subject under their consideration, and that the Legislature, both before and since the act of 1792, as aforesaid, have excluded the sections in question from an application to personal estate, (to say nothing of the other considerations before mentioned,) it follows, emphatically, that the original act of 1790, is also to be considered in forming a construction in this instance: and, if so, it is completely decisive in favour of my idea; for it not only is confined, expressly, to “real estates of inheritance only,” but the Legislature having in one section of the same act (sec. 2,) also had reference to and amended the act of distributions, and not having extended the provision in question to personal estate, in terms, it follows that that act (which indeed has never been denied) is exclusively confined to real estate.
On this point, so decisive of the question before us, of the competency of the Court to look into the act of 1790, in forming a construction upon that of 1792, I find a strong corroborative opinion of Judge Tucker himself, as stated in his edition of Blackstone, vol. 2, Appendix, p. 24. Speaking of the decision of this Court, in 208 the case of Brown v. *Turberville, he says that, “although” (as I understand him) “that decision could-not be justified if the act of 1792 had been an entire new law; yet being, in its present form, altogether a piece of patch work, the same construction cannot be made upon it as if it had been made originally what it now is.” If that act be a piece of patch work, the act of 1790, c. 13, must necessarily be a part thereof: for we are told-by Judge Pendleton, in delivering his opinion in the case of Brown v. Turberville, (as the fact undoubtedly is,) that the act of descents of 1792 was compounded only of the act of 1785 and that of 1790, c. 13. This act of 1792, therefore, not being ‘ ‘an entire new act,” but compounded as aforesaid, we are justified in looking into both the parts of which it is compounded, as well by the opinion of the author just cited, as by the general authorities I have mentioned: and if we look into the act of 1790, c. 13, we cannot possibly wink so hard as not to see that personal estate stands utterly excluded thereby.
It is another fundamental rule in the construction of statutes, that it is the business of Judges to know the mischief which *87 the statute was meant to remedy, and “so to construe the act as to suppress the mischief, and advance the remedy:”(a) a construction which leaves the mischief in full force and unredressed, and, a fortiori, one which enlarges or creates that mischief, is utterly inadmissible. We are told by Judge Pendleton, in the said case of Brown v. Turberville, that the mischief of the common law in relation to land, which was meant to be put an end to by the act of 1795, was “the inquiry when a man died intestate, perhaps at fourscore, how he came by his land;” and that this was done away by that act; and only restored by the act of 1790, in relation to land, during the short term of the infancy of a minor: that mischief is not permitted to exist, even in relation to land, for a longer term than that. Now, when we consider that land is permanent, and passes only by deed or will, and that acquisitions thereof can, therefore, be easily traced even for the term of 209 fourscore years, whereas '^personal property, being perishable and transitory, and passing also by mere delivery, (which circumstance also would give rise to much perjury and false swearing,) cannot readily nor easily be traced even for 18 or 21 years, shall I go too far to affirm, that the mischief of the common law (admitting it had ever applied to personals) is permitted, by this uniform construction, to exist in a greater degree with respect to chattels than to lands? or, in other words, that the lapse of 18 or 21 years is entirely1 as fruitful of mischief and difficulties, as to personal estate, as the lapse of fourscore years would be in relation to lands? It cannot be denied that the term of 21 years, is, in effect, a longer term in relation to tracing the genealogy of a sow and pigs! for example, than a century is relatively to a tract of land, under all the care the law has taken to place on record memorials of all conveyances of land whatsoever. The extension, therefore, of the limited term in question to the case of chattels, is entirely illusory and unequal: it undoubtedly opens a door to more mischiefs when applied to personal estate than when applied to lands, and is, in effect, a longer term when applied to the former than the latter; a consequence unavoidably resulting from the different natures of the subjects. Under pretence, therefore, of permitting the continuance or restoration, in part, of a mischief which never did exist in relation to chattels, we must take care not to create that mischief de novo, in its full extent, on the other hand, by implication, and under the delusive belief that it is merely coequal under a term of time, which, though nominally equal, is unavoidably rendered otherwise (to the disadvantage of chattels) by the discordant nature of the subject. I will here add, that, inasmuch as this principle of the blood of the first purchaser is to be applied to chattels, for the first time, in our code, it would require a much clearer legislative declaration to have that effect, than under a contrary state of things, than in the case of lands, on the other hand: it is much more natural and easy to suppose that the legislature meant to 210 ^restore in part, a system immcmorially existing in our country till of late, as relative to land, (to wnich subject also it is not in so great a degree unadapted,) than that they meant to create in its full extent a new principle, never before found in our code, as applicable to chattels, and which stands interdicted, as to them, by the actual difficulties of the case, and by irremediable circumstances, growing out of the nature of the subject.
In making the construction in the present case, it must never be forgotten, that it is a fundamental rule, that all statutes are to be expounded with reference to the nature of the subject matter thereof; which (whatever may be the words of a particular clause of an act) is supposed to have been always in the contemplation of the legislator, and all his expressions are to be directed and controlled thereby, (b) Thus, (to omit the common-place examples upon this point,) although the general words of our act of distributions refer the distribution of personal property' to the rules contained in the act concerning descents, which requires land to be divided specifically, ad infinitum, I presume it would not have required legislative aid to have authorized a Court to depart from the letter thereof, and decree a division by means of the sale of a slave, who (individually' taken) is not so partible: the nature of the subject in this case would prevent the division of the slave into two parts, and control the effect of the general words of the statute. And, again, if a question were to arise under doubtful or general words of an act adopting the principle of the blood of the first purchaser relatively to chattels through all time, (and I see little or no difference (as I have already said) between that case and such adoption for the long term of 21 y'ears as aforesaid,) the difficulty of ascertaining the quarter whence they were derived, amounting, in many, if not most cases, to an impossibility, and growing out of the nature of the subject matter, would undoubtedly turn the scale against the application of the principle, to property 211 of that kind. That, *in truth, is the question now before us: it differs from the case at bar only in degree, not in principle.
But we are told that these tyrannical and cabalistical words “same persons and proportions” are so imperious as to admit of no exception, and that the two species of property are to go to the same persons, and in the same proportions, in all possible cases whatsoever. This, it must be admitted, is not universally true: it is not true in the case of an alien, who is permitted to succeed to personal estate, and is prohibited from inheriting real. If there be an alien in the way, therefore, the two subjects do not go to the same persons; nor do they go in the same proportions; for, the alien being set aside in relation to lands, the remaining parceners will get a greater proportion of the land thereby: they will, in such case, get a greater proportion of the lands than of the personal estate of the infant, notwithstanding the reference in question. While we yield up this fa *88 vorite idea of uniformity, in obedience to the provisions of the ordinary laws of alienage, why shall we not also succumb to those overruling and paramount considerations, growing out of the nature of the subject, which, in point of fact, and under the actual operation of the rule, set such uniformity at defiance?
My conclusion then is, that the act of descents merely gives the general rule for the distribution of personal property by reference to the act of descents: but that, taken as well in relation to other laws or statutes, as to considerations which are equal to such laws or statutes, it is only “lex sub graviori lege.” I will not bottom myself upon the mere letter of the statute, (and that, too, couched only under general words of reference,) and obstinately contend for a construction which is reprobated by the actual nature of the subject, confronted by so many absurdities, contradictions, inconveniences and incongruities; and the consequences of which will operate undoubtedly against the manifest intention of the Legislature.
*Upon the whole, 1 am of opinion that the law is for the appellants in both the cases, (of Dilliard v. Tomlinson and Curtis v. Muse,) and that the decrees therein ought to be reversed. As, however, the other Judges are of a different opinion, I shall be ready to pass my opinion upon any subordinate points of a decree to be rendered, pursuant to that of the majority of the Court.
■JUDGE ELEMING
delivered the following opinion in the case of Dilliard v. Tomlinson. Three points were made by the appellant’s counsel.
1st. Whether the former decision in this case be a bar to a rehearing of the merits of the cause, respecting the rights of the parties? If not,
2ndly. Whether the merits be not in favour of the appellant? And, if not,
3dly. Whether there is not error in the report of Master Commissioner Rose, respecting the profits of the negroes in question; and whether there is not error in the decree, affirming that report; and in decreeing interest on 1951. 4s. Sd. from the first day of January 1802, until payment shall be made?
The first was a point that I did not expect would have been made; though much was said in support of it; but the only plausible argument used was, that the decree of this Court, reversing that of the Chancellor, was an interlocutory decree, and therefore open to future discussion. That decree was made by a full Court, consisting of five members, after able and solemn arguments of counsel, and long deliberation of the Judges; and the rights of the parties respecting the subject in controversy clearly and finally decided by a majority of four to one: and what has been called an interlocutory decree, was a consequential and necessary order, growing out of the nature of the case, for carrying into effect the decree that had so expressly, and conclusively, determined the rights of the parties. And should this Court, the dernier resort in all our judicial pro-213 ceedings, Consisting now of only three members, (but of whatever number it may consist, it makes no difference as to principle,) furnish a precedent to reverse its own judgments or decrees, after a lapse of eight or nine years, the evil consequences would be incalculable. That great and many mischiefs would consequently ensue, must, I conceive, be so obvious to every reflecting mind, that it seems unnecessary further to animadvert on the subject.
2. With regard to the second point, 1 ‘whether the merits be not in favour of the appellant?” the decision of the first seems to preclude the necessity of any remarks upon it; but out of respect to the ingenious arguments of the counsel who stated it, and for my own satisfaction, I reconsidered the subject with great attention ; but the more I reflected on it, the more was I convinced of the correctness of the former decision of this Court. I am not, generally tenacious of my own opinions; but all the law-learning and eloquence of Westminster-Hall could not convince me that the decision (as the law then stood) was erroneous. The words of the law were, in my conception, too clear and explicit to admit of a doubtful meaning.
3. With respect to the third point, whether there was not error in the report of Master Commissioner Rose, respecting the profits of the negroes in question, and whether there is not error in the decree affirming that report; and decreeing interest on 1951. 4s. 5d. from the first day of January, 1802, until payment shall be made?
I discover no error in so much of the report as states the profits of the negroes in question to be 1951. 4s. 5d. and is affirmed by the decree; but there appears to be error in so much thereof as allows 151. Is. Id. interest on those profits ; and there is error in directing .it to be continued beyond the date of the decree, which was not, at the time of making the decree, authorized by law, the act allowing Chancery Courts to award interest on final decrees, not having passed until the 20th of January following: but, as to the profits themselves, I have no 214 doubt but that the appellees *have a right to them, in exclusion of the mother, and any relations on the part of the mother; not only because this Court hath so adjudged it, but also, because it seems clear to me that the right to profits follows the right to the subject out of which they issue, as the shadow follows the substance.
I am therefore of opinion that the decree ought to be reversed, so far as it respects the interest, and affirmed as to the residue.
The following was entered as the decree of this Court.
“The Court is of opinion that there is error in so much of the said decree as directs the payment of the sum of 151. Is. Id. by the appellant, as administrator of Benjamin Edloe Tomlinson, deceased, for interest on the hire of slaves, for which he is supposed to have been chargeable from the day the money for their hire became due from the persons to whom the slaves were hired, although there be no proof that the same was then received ■ by the said administrator, and it was in this case doubtful to whom *89 the same ought to be paid; and, also, in this, that the interest upon the same was directed to be continued beyond the date of the decree, which was not then authorized by law. Therefore, it is decreed and ordered, that the said decree be reversed and annulled; and that the appellees pay to the appellant his costs by him expended in the prosecution of his appeal aforesaid here. And this Court, proceeding to make such decree as the said Superior Court of Chancery ought to have pronounced, it is further •decreed and ordered, that the appellant pay unto the appellees the sum of 1951. 4s. 5d. and their costs by them expended, as well in the prosecution of their appeal formerly in this Court, as in the prosecution of their suit m the said Superior Court of Chancery. ’ ’
*The following opinion was pronounced in the case of Wyatt, Adm’r of Curtis, v. Muse and Wife, by
JUDGE TUCKER.
This cause depending in great measure upon the same principles as that of Dilliard v. Tomlinson, I find it necessary to say no more upon the subject, generally. The limitations in the will of William Murray, the father of the infants Mary Anne and Fanny Murray, deceased, and of the complainant Harriet Muse, leave no question to be decided as to the operation of the law ot descents upon that portion of his estate.
But I am of opinion, that the slaves and personal estate of those infants respectively are to be distributed among their next of kin, according to the course of law at the time of their respective deaths; that is to say, that the slaves and personal estate of Mary Anne Murray ought to be distributed between her mother and surviving sisters, in the manner prescribed by the act, passed in the year 1785, entitled an act directing the course of descents, which act, as to personal estate, was in full force at the time of her decease. And that the slaves and personal estate of Fanny Murray, which were derived to her immediately from her father William Murray, upon her death became liable to distribution according to the course in which lands are to descend, under the act passed in the year 1792, entitled an act to reduce into one the several acts directing the course of descents; subject to the proviso which is contained in the fifth section of that law. But that the slaves and personal estate of that infant, which were not immediately derived from her father, including under that description the rents, issues, and profits of lands, the hire and increase of slaves, and the interest of money, or any other property acquired after the death of the father, (including also in that description the sum of 1001. charged upon the lands devised to the complainant Harriet Muse, on the contingency in the father’s will expressed,) where the same can be clearly and definitively ascertained, ought to be distributed among the next of kin of that infant, 216 in 'x'the same manner, and in the same proportions, as if she had attained her full age of 21 years at the time of her decease. lam further of opinion, that if it shall appear that the complainant Harriet Muse, or her husband, entered upon the lands devised to her upon the contingency of the death of her sister Mary Anne, on her paying to her sister Fanny Murray, one hundred pounds current money, that complainant, or her husband, ought to be charged with interest upon that sum from the time of such entry, and possession taken and held, or upon so much thereof as ought to be paid to the distributees of the said Fanny Murray, other than the said Harriet Muse. And that this cause be sent back to the Court of Chancery with directions that an account (if required by either party) .be taken, and distribution made according to these principles.
I wish it to be understood that Charles Curtis, the husband of Anne Murray, mother of Mary Anne and Fanny Murray, and also the father of Joanna Curtis and Christopher Curtis, deceased, is entitled to the distributive shares of all those persons.
JUDGE FLEMING.
Upon the death of William Murray, his widow, Anne Murray, having renounced the will of her deceased husband, took, as her dower, three ninths of his slaves, and other personal estate; and his three daughters, Mary Anne, Harriet, and Fanny Murray, each two ninths thereof. Upon the death of Mary Anne Murray, in March, 1793, before the act of December, 1792, c. 92, was in force, her mother, then the wife of Charles Curtis, the appellant, succeeded to two equal eighth parts of her slaves, and other personal estate : two other equal eighth parts vested in each of her surviving sisters, Harriet and Fanny Murray; and one equal eighth part vested in each of her brother and sister of the half-blood, to wit, Christopher and Joanna Curtis. And of the reversionary interest in the dower slaves of her mother, two equal sixth parts vested in each of her said sisters, and one equal sixth part in each of her said brother and sister of the half-blood.
*Upon the death of Joanna Curtis, in July, 1793, the estate derived to her from Mary Anne Murray, her sister of the half blood, vested in her father Charles Curtis, the appellant, who, upon the death of his son Christopher Curtis, in April, 1795, became entitled to one other eighth part of the estate of the said Mary Anne Murray, deceased, making, in the whole, a moiety thereof.
With respect to the estate of Panny Murray, she having died whilst the act of 1792, c. 92, was in full force, her mother, and brother and sister of the half blood, were thereby excluded from any distributive share of her estate.
The following decree was thereupon entered.
“The Court is of opinion that there is error in the said decree in reversing so much of the decree in the original suit brought by Charles Curtis, and Elizabeth Curtis, an infant, by the said Charles, her father and next friend, against Peter Kemp, executor of William Murray, and Harriet Murray, only surviving child of the said William Murray, as declares that, by the statute for distributing personal estate, including slaves unbequeathed, the plaintiff, Charles Curtis, (in right of his wife and his two elder children by her, who are dead, *90 and whom he represented,) is entitled to one half of the personal estate of Mary Anne Murray; and as directs that the said Peter Kemp, defendant in that suit, should render an account of his administration of the estate of his said testator,.before , Commissioners appointed to examine, state and report on the same; and as decrees that the said Peter should pay and deliver to the plaintiff in that suit, Charles Curtis, one half of the slaves and other personal estate of the said Mary Anne Murray; and as approves and confirms the report of the Commissioners made in pursuance of that decree and order: and that there is also error in so much of the first mentioned decreé on the bill of review as dismisses the bill in the original suit with costs; this 218 Court being of opinion *that so much of the said original decree as relates to the estate of Mary Anne Murray, deceased, is correct, and ought to have been affirmed on the said bill of review; and that the residue of the said decree in the original suit was properly reversed; it is therefore decreed and ordered, that the decree in this suit be reversed and annulled, and that the appellants recover against the appellees their costs by them expended in the prosecution of their appeal aforesaid here. And this Court proceeding to make such decree as the said Superior Court of Chancery ought to have rendered on the bill of review aforesaid, it is further decreed and ordered, that the said Peter Kemp do pay and deliver to the appellant, Peter Wyatt, administrator of Charles Curtis, one half of the slaves and personal estate which were of the estate of the said Mary Anne Murray, deceased, and account for the profits of the said slaves from the time of her death, and pay the same to the said Peter Wyatt, administrator, of the said Charles Curtis. And it is ordered, that the cause be remanded to the said Superior Court of Chancery for an account to be taken, and further proceedings to be had therein, agreeably to the principles of this decree.”

 Morris, Overton and others v. Ross, 2 H. & M. 408.

 2 Ves. jun. 165, 166.

 3 Call, 24.

 2 Call, 419, 420.

 MS.

 3 Call, 461.

Vide Newell v. The Commonwealth, 2 Wash. 88, and Jones v. The Commonwealth, 1 Call, 555.

 1 Call, 328.

 See acts of that session, p. 37.

 1 Rev. Code, p. 426.

 6 Bac. 381, and Judge Pendleton, 2 Call, 406.

 1 Bl. Com. 88, Christian's note.

b) 1 P. Wms. 663.

 3 Call, 351.

a) 1 Bl. Com. 91.

 1 Rev. Code, 164, s. 27.

 3 Bac. 380, and Judge Pendleton, in Brown v. Turberville, 2 Call, 405.

 3 Bac. 388.

 6 Bac. 391.

 6 Bac. 362, Doug. 30.

 Lowndes v. Lewis, stated by Christian in a note to 1 Bl. Com. 60.

 1 Bl. Com. 87.

 1 Bl. Com. 60.